# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 10, 2015 Session

## STATE OF TENNESSEE v. TYRONE LEROY WATTS

### Appeal from the Circuit Court for Bedford County
### No. 17641    Franklin L. Russell, Judge

.

### No. M2013-02750-CCA-R3-CD – Filed June 23, 2015

.

The Defendant, Tyrone L. Watts, appeals his conviction for attempted terrorism. He challenges the sufficiency of the evidence and the trial court's failure to provide complete jury instructions defining what would constitute an "imminent threat of death or serious bodily injury." Following our review, we conclude that the evidence is insufficient to support the Defendant's conviction for attempted terrorism. Accordingly, we reverse the judgment of the trial court and remand for sentencing on the Defendant's alternative conviction for disorderly conduct in count one.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and TIMOTHY L. EASTER, J., joined.

Robert L. Marlow, Shelbyville, Tennessee, for the appellant, Tyrone Leroy Watts.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Robert Carter, District Attorney General; and Michael Randles and Richard Cawley, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I.  Factual and Procedural Background

On February 25, 2013, the Bedford County Grand Jury indicted the Defendant on two counts of filing a false report.  On April 15, 2013, the grand jury issued a superseding indictment, charging the Defendant with two counts of terrorism.[1]  Following a trial on June 24-25, 2013, a jury convicted the Defendant in count one of the lesser-included offense of disorderly conduct, a Class C misdemeanor, and in count two of the lesser-included offense of attempted terrorism, a Class B felony.  The trial court merged count one into count two and sentenced the Defendant, as a Range II multiple offender, to sixteen years in the Department of Correction.[2]  The trial court denied the Defendant's motion for new trial, and this timely appeal followed.

*Trial*

Kimberly Jo Joyce testified that she worked as the front desk secretary at Thomas Magnet School in December 2012.  Ms. Joyce explained that visitors to the school were required to sign a visitor log, which she kept at her desk in the school's office.  On the afternoon of December 12, 2012, Tina Watts and her husband, the Defendant, came into the school office and signed in as visitors.  Mrs. Watts and the Defendant were bringing cupcakes for Mrs. Watts's son, W.T.,[3] and his class in order to celebrate W.T.'s birthday.  Near the end of the school day, around 2:40 p.m., Mrs. Watts and the Defendant returned to the office and signed out.  Ms. Joyce, who was on the phone when Mrs. Watts and the Defendant signed out, noticed that they had W.T. with them as they left.

Based upon prior conversations with the school's principal, Mindi DeWitt, Ms. Joyce knew that a court-ordered parenting plan restricted when Mrs. Watts could pick up W.T. from school.  Mrs. Watts was only allowed to pick up W.T. every other Friday, unless the school received a phone call from W.T.'s father, Lamont Taylor, stating otherwise.  On this particular day, Mr. Taylor had not notified anyone at the school that Mrs. Watts was picking up W.T.  Ms. Joyce immediately got off of the phone and radioed Principal DeWitt, who was outside dismissing students for the day.  Ms. Joyce informed

---

[1] The two counts charged alternative theories under the terrorism statute but were based upon the same conduct.

[2] Although the trial court did not impose a sentence for disorderly conduct in count one, the record includes a judgment of conviction for that offense, in which it is noted that the conviction merged into count two.

[3] In the interests of privacy, it is the policy of this court to refer to minors by their initials only. The Defendant is W.T.'s stepfather.

the principal that Mrs. Watts had signed out W.T. and was walking out the front door with him. Principal DeWitt told Ms. Joyce that she had not talked to Mr. Taylor and that Mrs. Watts "can't do that." Ms. Joyce ran out the school's front door and stopped the Defendant, Mrs. Watts, and W.T. on the sidewalk. She explained to them that the school had not received a phone call from Mr. Taylor giving permission for Mrs. Watts to pick up W.T. The Defendant mentioned that it was "very cold outside" and suggested that they "go back in and talk about this."

When they returned to the school office, Ms. Joyce sat behind her desk, and Mrs. Watts stood in front of the desk. The Defendant and W.T. sat in two chairs that were about six or seven feet from the front of Ms. Joyce's desk. Ms. Joyce attempted to call Mr. Taylor several times but could not reach him. Mrs. Watts then showed Ms. Joyce a text message from Mr. Taylor that she had received the night before, in which Mr. Taylor said that Mrs. Watts could pick up their son from school the following day. After seeing the text message, Ms. Joyce again radioed Principal DeWitt. She explained that Mrs. Watts had a text message from Mr. Taylor but that she could not reach Mr. Taylor by phone. The principal instructed Ms. Joyce that school personnel had to speak to Mr. Taylor before allowing Mrs. Watts to leave with W.T.

While Ms. Joyce was attempting to call Mr. Taylor, Mrs. Watts went over to W.T. and told him, "Once again . . . [y]ou can thank your dad, Lamont, for this." W.T. was upset and crying. Ms. Joyce then heard the Defendant say to W.T., "Son[,] this is what stress will do to you. You will die by the time you're . . . [twelve] years old with a heart attack." Ms. Joyce continued to try to reach Mr. Taylor by phone but was not successful. After about ten or fifteen minutes, the Defendant told Mrs. Watts, "We've got two options . . . [w]e can either contact your attorney or we can keep trying to get in touch with him . . . ." While still on the phone attempting to contact Mr. Taylor, Ms. Joyce then heard the Defendant tell W.T.,

> When I get back to the doctor next Tuesday and [] get the news that I have cancer . . . [y]ou have nothing to worry about . . . I'm going to come back in here with an AK-47 . . . I'm going to kill everybody in here and then kill myself.

Ms. Joyce testified that she felt "panicked" and "scared" when she heard this. Ms. Joyce immediately went into the office behind her desk and told the two other staff members there that she was going to get the principal. Ms. Joyce ran down the hallway to where Principal DeWitt was dismissing students and told Principal DeWitt what the Defendant had said. When Principal DeWitt entered the front office, she told the Defendant, "This is your one and only warning. . . . [y]ou don't say something like that in my school." The principal then went into her private office to make some phone calls.

- 3 -

The Defendant and W.T. left the office to look at a gingerbread sculpture located in the front lobby. Mrs. Watts then apologized for the Defendant's comment. After the Defendant and W.T. had returned to the office, Principal DeWitt finished her phone calls and came out of her office. At this point, the Defendant again said something to W.T. "about getting an AK-47 and coming back in there and killing everybody there including himself."

Ms. Joyce testified that, although she felt scared and intimidated by the Defendant's comments, she did not call the police after hearing the statements. At one point, she asked Principal DeWitt if they should call 9-1-1, and Principal DeWitt said not to call. Ms. Joyce testified that she left school at 3:30 p.m., about 20 minutes after the Defendant and Mrs. Watts.[4] As she was leaving the school parking lot, Ms. Joyce saw Officer James Wilkerson with the Shelbyville Police Department and explained to the officer what had happened that afternoon.

On cross-examination, Ms. Joyce explained that, while the Defendant had been talking loudly enough that she could hear him, nothing in the Defendant's tone of voice caused Ms. Joyce to notice him. Ms. Joyce stated that she believed the Defendant's threat and, if she had it to do over again, she would immediately call 9-1-1. She acknowledged that the Defendant had said he was going to go somewhere, see a doctor, get bad news, and then he would come back to the school. When Ms. Joyce was asked whether the Defendant "was going to go outside and come right back in, in the next 15, 20 minutes," she replied, "Well, still he made the threat. Whether he came right back in or he came the next day."

Susan McClenney, the bookkeeper for Thomas Magnet School, testified that she was in the school's office on December 12, 2012, when the Defendant and Mrs. Watts were attempting to sign out W.T. Ms. McClenney was at her desk that was located in an area behind Ms. Joyce's desk. Because of a wall separating the two areas, Ms. McClenney could not see Ms. Joyce's desk, but she could hear Ms. Joyce talking on the phone. Ms. McClenney was also aware that a parenting plan restricted when Mrs. Watts could pick up W.T. from school and that Mr. Taylor had to send a note or call the office staff to approve her picking up W.T. on unscheduled days. From her desk, Ms. McClenney could not see the Defendant, but she heard him tell W.T. that "he was going to bring an AK-47 to school and kill everybody in the office and then he was going to kill himself." Ms. McClenney testified that she took the Defendant's comment seriously, was "scared," and "couldn't believe he just said that." When asked, Ms. McClenney stated that she had felt like she was in imminent danger. Ms. McClenney wanted to report the

---

[4] According to Ms. Joyce, W.T. did not leave school with Mrs. Watts and the Defendant that day. Because the school was not able to reach Mr. Taylor, W.T.'s stepmother picked up W.T.

Defendant's comment to the police, and after the Defendant and Mrs. Watts left the office, she asked Principal DeWitt about calling 9-1-1.

On cross-examination, Ms. McClenney stated that, ultimately, she did not call the police or anyone else about the incident and she left the school about ten minutes after the Defendant and Mrs. Watts. She explained that Principal DeWitt did not want to call the police because the science club was meeting and they "had a gym full of children." She clarified that the Defendant was not yelling and he did not sound angry when he made the remark to W.T. Ms. McClenney testified that, at one point, the Defendant went outside the office with W.T. to look at the gingerbread sculpture in the lobby. Although there was a door separating the office and the lobby, Ms. McClenney did not feel that she needed to get up and lock the door at that time. According to Ms. McClenney, the school did not revise its policies on how to handle such an event following this incident. She said that she is still supposed to notify the principal but that she would call 9-1-1 if something similar happened again.

Sandy Allen, the school nurse at Thomas Magnet School, testified that she was in the office helping with afternoon dismissal when the Defendant and Mrs. Watts came into the office with W.T. The Defendant and W.T. sat in some chairs in the front office about five or ten feet away from Ms. Joyce's desk. Ms. Allen explained that she was standing at Ms. McClenney's desk, which was behind a partition about fifteen feet away from Ms. Joyce's desk. From Ms. McClenney's desk, Ms. Allen heard the Defendant say that "he was going to come back to school and shoot everybody and then shoot himself." Ms. Allen was scared and intimidated by the Defendant's statement, but she did not do anything to address the threat. She continued to stand by Ms. McClenney's desk. Ms. Allen explained that she did not call 9-1-1 because she believed that Principal DeWitt was going to call the police and "handle the situation." Ms. Allen left the school at her normal time, 3:00 p.m. She testified that she thought that the principal should have called the police.

On cross-examination, Ms. Allen acknowledged that, when the Defendant made the threatening comment, he was talking to W.T. The Defendant was not talking to her. Although the Defendant did not raise his voice, he was speaking loudly enough that Ms. Allen could hear him. Ms. Allen did not find the tone of the Defendant's voice alarming; rather, it was the content of his comment that caused her to be alarmed and fearful. Ms. Allen explained that she wanted to leave the building because of the Defendant's threat. Ms. Allen did not personally speak to the principal or hear anyone else ask the principal about calling the police. She testified that she had not felt the need to call law enforcement as it was Principal DeWitt's job to call 9-1-1.

School principal, Mindi DeWitt, testified that, in the early afternoon of December 12, 2012, she saw the Defendant and Mrs. Watts in the school's hallway carrying cupcakes to W.T.'s birthday party. At 2:20 p.m., Principal DeWitt made afternoon announcements and then went outside to the front of the building to dismiss bus riders and car riders. Around 2:40 p.m., as she was directing traffic, Principal DeWitt received a call over her walkie-talkie from Ms. Joyce. Ms. Joyce informed her that Mrs. Watts wanted to sign out W.T. from school that day. Principal DeWitt told Ms. Joyce that was "not going to be okay because it was not [Mrs. Watts's] day to pick him up." Ms. Joyce advised that she would attempt to call Mr. Taylor and obtain permission. Principal DeWitt remained outside, dismissing car riders. About ten minutes later, Ms. Joyce called her again over the walkie-talkie. Ms. Joyce said that she "needed [Principal DeWitt] to come into the office." She met Ms. Joyce in the hallway on the way to the office and noticed that Ms. Joyce was visibly upset. Ms. Joyce told Principal DeWitt about the Defendant's threatening comment.

Inside the office, Principal DeWitt spoke to Mrs. Watts and then went into her private office to look at her copy of Mrs. Watts's parenting plan. Based upon the wording of the parenting plan, Principal DeWitt felt that she needed to speak to Mr. Taylor before allowing W.T. to leave with Mrs. Watts. She went to Ms. Joyce's desk and attempted to call Mr. Taylor. At that point, Principal DeWitt heard the Defendant say to W.T., "That's okay, I've got a, you know, I've got to go to the doctor on the 19th and, you know, when I find out I have cancer, I'm going to come back and take care of this." Although she did not hear the Defendant's initial threat, Principal DeWitt believed that the Defendant's comment referred back to the original threat. Principal DeWitt immediately told the Defendant, "Sir, you are not welcome to come to this school and make those kind[s] of statements, if you're going to say things like that, you're not going to be welcome in Thomas [Magnet School] anymore."

Principal DeWitt testified that, although she believed the Defendant's statement was intended to intimidate her, she was not scared. After being unable to reach Mr. Taylor, she called other individuals who were on the "authorized pickup list" for W.T. After calling through the list, Principal DeWitt stepped back into her office and called her supervisor. After speaking to her supervisor, Principal DeWitt told Mrs. Watts that W.T. could not go home with her unless they heard from Mr. Taylor. Principal DeWitt testified that the Defendant raised his voice a couple of times and was pacing inside the office. Principal DeWitt wanted Mrs. Watts and the Defendant to leave the building because the school's science club was meeting in the gym.

Eventually, after Mrs. Watts and the Defendant left the school, Principal DeWitt contacted the police and asked about getting a restraining order to keep the Defendant off of the school campus. The principal was told that she needed to call the commissioner,

and the commissioner told her that she needed to file a report on the incident. Before she could call back to file a report, Officer Wilkerson arrived at the school, and Principal DeWitt reported the incident to him.

Principal DeWitt testified that, after the incident, patrol officers stopped by the school on a regular basis. Additionally, the school was assigned a School Resource Officer from the Bedford County Sheriff's Department. Principal DeWitt reviewed "lockdown procedures" with her teachers and made sure that doors leading to the exterior of the building were not propped open. The next day, she also showed a photograph of the Defendant to each teacher and instructed that she was to be notified immediately if the Defendant was seen at the school.

On cross-examination, Principal DeWitt testified that she was not scared or intimidated by the Defendant's statement but she believed the Defendant's intent in making the statement was to intimidate school personnel. She explained, "My concern in that situation was not that we were in danger at that immediate moment. It was the reaction that he was going to have—I was much more concerned the following morning that he may come back to [the] school."

Principal DeWitt did not recall if members of her staff asked about calling 9-1-1. She stated that, if they did, she would have told them not to call the police. Principal DeWitt was concerned about the children in the science club meeting and believed that she could defuse the situation rather than "causing a scene by calling the police." She knew that the Defendant and Mrs. Watts wanted to leave the school with W.T. so they could spend time with him on his birthday. She tried to find someone on the approved list to pick up W.T. so that he could be released from school. Principal DeWitt explained, "I just felt . . . that the best case scenario was to [defuse] the situation and get them out of the building rather than involving the police if we could resolve the situation."

Officer James Wilkerson, with the Shelbyville Police Department, testified that he arrived at Thomas Magnet School around 3:30 p.m. on December 12, 2012. Officer Wilkerson explained that he had been out on patrol when he got a call from a friend whose wife was a teacher at the school. As Officer Wilkerson pulled into the school's parking lot, he saw Ms. Joyce. Ms. Joyce, who was visibly upset, told the officer what had happened and that the Defendant was no longer on the school campus. Officer Wilkerson then went inside the school office and spoke to Principal DeWitt. After taking a report, Officer Wilkerson obtained a warrant for the Defendant's arrest.

Officer Wilkerson testified that he took the threat "very seriously" and had another officer stationed at the school that afternoon until the science club meeting was over.

Additionally, Officer Wilkerson instructed other officers to do random walkthroughs at the school for the rest of the week in case someone showed up to harm the staff or students. Officer Wilkerson explained that, two days after this incident, the shooting at Sandy Hook Elementary School occurred. Since that time, he has continued to instruct other officers to patrol at Thomas Magnet School throughout the day when school is in session.

Detective Brian Crews, with the Shelbyville Police Department, testified that he interviewed the Defendant about the incident at Thomas Magnet School. The Defendant explained to Detective Crews that, after he and Mrs. Watts brought cupcakes to the school for W.T.'s birthday, they were not permitted to take W.T. home. When they tried to leave, Ms. Joyce stopped them and asked that they come back inside the school. The Defendant explained that the school could not get in touch with Mr. Taylor and he and Mrs. Watts were agitated by the situation. The Defendant initially denied making any threatening statements. He then told Detective Crews that, while speaking to W.T., he said, "You know, there's been another mall shooting today and it was similar to the shooting where Gabrielle Giffords, the representative was shot . . . it's the little things like this that make people do things like that." The Defendant also told W.T., "I'm not going to go through chemo and that will be it for me and then you can go to school wherever you want to. I won't be in the way." The Defendant acknowledged that Principal DeWitt confronted him about his comments and that he apologized to her and Ms. Joyce. The Defendant also admitted that he had a doctor's appointment the following week and there was a possibility he had cancer.

Mrs. Watts testified that, the night before this incident, Mr. Taylor had agreed that she could take W.T. with her after school the following day. Mrs. Watts signed out with W.T. at 2:40 p.m. and left the building, but Ms. Joyce ran outside after them. Ms. Joyce told Mrs. Watts that she could not let Mrs. Watts leave with W.T. Because it was very cold outside, they went back inside the school office to address the situation.

While speaking to Ms. Joyce, Mrs. Watts became agitated and frustrated that Mr. Taylor had failed to notify the school that she would be picking up W.T. During this time, the Defendant and W.T. were sitting in some chairs behind Mrs. Watts talking. Mrs. Watts did not hear the Defendant make any threats about an AK-47, and no one said anything to her about the Defendant making inappropriate comments. She did not recall the principal having a conversation with the Defendant. Mrs. Watts testified that, at one point, the Defendant left the office with W.T. to look at a gingerbread house because Mrs. Watts was "becoming more frustrated with the situation." Mrs. Watts knew that the people in the office were concerned by the situation, and she apologized for becoming frustrated. Mrs. Watts denied that the Defendant apologized to any school personnel.

Based upon this testimony, the jury convicted the Defendant of disorderly conduct and attempted terrorism.

## II. Analysis

### A. Sufficiency of the Evidence

The Defendant contends that there is insufficient evidence to support his conviction for attempted terrorism and that the weight of the evidence is against the jury's verdict. He asserts that the statements he made to W.T. inside the school office would not place a reasonable person in fear of "imminent" serious bodily injury because the statements "communicat[ed] [an] intent to commit a violent act in the future conditioned upon the occurrence of a future event." The Defendant further argues that, although three individuals from the office testified that the Defendant's comments caused them to feel shocked, scared, and afraid, these witnesses clearly did not view the threat as "imminent" because they took no "evasive action to avoid harm or . . . immediate action to stop the threat from occurring."

The applicable standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and the Appellant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

In a jury trial, the weight and credibility given to the testimony of witnesses, as well as the reconciliation of conflicts in that testimony, are questions of fact best determined by the jury, because they saw and heard the witnesses, and by the trial judge, who concurred in and approved the verdict. Bland, 958 S.W.2d at 659. This court will not reweigh the evidence. Id. On review, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

Following the attacks of September 11, 2001, the Tennessee General Assembly passed the Terrorism Prevention and Response Act of 2002, criminalizing acts of terrorism under state law. See 2002 Tennessee Laws Pub. Ch. 849; Tenn. Code Ann. §

39-13-805 (2012). As part of this legislation, our general assembly declared that the "threat of terrorism involving weapons of mass destruction, including, but not limited to, biological, chemical, nuclear, or radiological agents," was a compelling public safety and health concern that could "result in a disaster placing residents of Tennessee in great peril." Tenn. Code Ann. § 39-13-802(a) (2012). Furthermore, the general assembly found that "hoaxes involving terrorist threats" created a substantial drain on governmental resources and were a significant disruption to the operation of government and to residents' sense of personal security. Id. As such, the stated purpose of the new legislation was:

> to sanction the possession, manufacture, use, or threatened use of chemical, biological, nuclear, or radiological weapons, as well as the intentional use or threatened use of industrial or commercial chemicals as weapons, to take other steps to prevent the occurrence of terrorist acts to the fullest extent possible, and to respond rapidly and effectively to any terrorist acts.

Id.[5]

Tennessee Code Annotated section 39-13-805 provides that "[i]t is an offense for any person to commit an act of terrorism in this state." Tenn. Code Ann. § 39-13-805(a) (2012). An act of terrorism is a Class A felony. Id. § 39-13-805(b) (2012).

> "Act of terrorism" means an act or acts constituting a violation of this part, *any other offense under the laws of Tennessee*, or an act or acts constituting an offense in any other jurisdiction within or outside the territorial boundaries of the United States that contains all of the elements constituting a violation of this part or is otherwise an offense under the laws of such jurisdiction, that is intended, directly or indirectly, to:
>
> > (A) Intimidate or coerce a civilian population;
> >
> > (B) Influence the policy of a unit of government by intimidation or coercion; or
> >
> > (C) Affect the conduct of a unit of government by murder, assassination, torture, kidnapping, or mass destruction;

Tenn. Code Ann. § 39-13-803(1) (2012) (emphasis added).[6]

---

[5] We note that the Defendant has not raised the issue of whether an automatic weapon, such as an AK-47, would constitute a "weapon of mass destruction" whose possession, manufacture, use, or threat of use is intended to be sanctioned under this statute.

As the Defendant was convicted of attempted terrorism, we note that a person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute an offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a) (2012).

Count two of the indictment alleged that the Defendant committed an act of terrorism by "intentionally initiating or circulating a report of a past, present, or impending bombing, fire or other emergency knowing that the report is false and knowing it will place a person in fear of imminent serious bodily injury and that was intended, directly or indirectly, to intimidate or coerce a civilian population, in violation of Tennessee Code Annotated § 39-16-502 and 39-13-805 . . . ." Thus, in order for the State to establish that the Defendant committed an act of terrorism, the State had to first prove that the Defendant committed the offense of initiating or circulating a false report. Specifically, as charged here, the State had to prove the following elements of a false report: (1) that the defendant intentionally initiated or circulated a report of a past, present, or impending bombing, fire or other emergency; (2) that the defendant acted knowing that the report was false or baseless; and (3) that the defendant acted knowing that the false report would place a person in fear of imminent serious bodily injury. See Tenn. Code Ann. § 39-16-502(a)(3)(B) (2012); 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 26.02. "Report" applies to a written or oral statement initiated by a person. See State v. Levandowski, 955 S.W.2d 603, 605 (Tenn. 1997), superseded by statute as stated in State v. Smith, 436 S.W.3d 751, 769-70 (Tenn. 2014).

---

[6] Despite the breadth of this statute, the Defendant has not challenged its constitutionality. See generally Tasia E. McIntyre, Note, Protecting Against Terrorism or Symbolic Politics?: Fatal Flaws in Ohio's Criminal Terrorism Statute, 56 CASE W. RES. L REV. 203(2005) (analyzing similar language found in Ohio's anti-terrorism statute and concluding that it is constitutionally infirm).

"[A] person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18) (2012). A person acts "knowingly" if that person acts with an awareness: (1) that his or her conduct is of a particular nature; or (2) that a particular circumstance exists; or (3) that the conduct was reasonably certain to cause the result. See Tenn. Code Ann. § 39-11-106(a)(20) (2012); 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 2.09.

While the false reports statute requires that a person be placed in fear of imminent serious bodily injury, the statute does not define the term "imminent," and we have discovered no case law defining the word for purposes of the false reports statute. However, in reviewing the requirement that a defendant place another person "in imminent danger of death or serious bodily injury" under the reckless endangerment statute, the Tennessee Supreme Court quoted with approval the following definition of "imminent":

> Near at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous. Something which is threatening to happen at once, something close at hand, something to happen upon the instant, close although not yet touching, and on the point of happening.

State v. Payne, 7 S.W.3d 25, 28 (Tenn. 1999) (quoting Black's Law Dictionary 750 (6th ed. 1990)). Based upon this definition, the court explained that a person "must be placed in a reasonable probability of danger as opposed to a mere possibility of danger" for the threat of death or serious bodily injury to be "imminent" under the reckless endangerment statute. Id. (citing State v. Fox, 947 S.W.2d 865, 866 (Tenn. Crim. App. 1996)).

A conviction under the false reports statute, however, does not require that a defendant place another in imminent danger of serious bodily injury; instead, the statute proscribes placing another person in *fear* of imminent serious bodily injury. See Tenn. Code Ann. § 39-16-502(a)(3)(B). Our assault statute contains a similar prohibition against "causing another to reasonably fear imminent bodily injury." See Tenn. Code Ann. § 39-13-101(a)(2) (2012). In discussing the element of fear in the assault statute, this court has held that "[t]he element of 'fear' is satisfied if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear imminent bodily injury" and that the apprehension of imminent bodily harm required for an assault conviction may be inferred from surrounding

circumstances.[7] See State v. Christopher Carter, No. W2006-02124-CCA-R3-CD, 2007 WL 3391385, at *5 (Tenn. Crim. App., Nov. 15, 2007), perm. app denied (Tenn. Apr. 7, 2008) (quoting State v. Gregory Whitfield, No. 02C01-9706-CR-00226, 1998 WL 227776, at *2 (Tenn. Crim. App., May 8, 1998), perm. app denied (Tenn. Dec. 7, 1998)).

In this case, even when viewed in the light most favorable to the State, we cannot conclude that sufficient evidence was presented to prove beyond a reasonable doubt that the Defendant is guilty of attempted terrorism because the State failed to establish all of the elements of false report. We agree with the State that the evidence shows the Defendant initiated a report about an impending emergency, *i.e.*, the Defendant bringing an AK-47 to school to kill others and himself, and that the Defendant knew this report was false or baseless. Inside the school office, the Defendant made the statement to W.T. that,

> When I get back to the doctor next Tuesday and [] get the news that I have cancer . . . [y]ou have nothing to worry about . . . I'm going to come back in here with an AK-47 . . . I'm going to kill everybody in here and then kill myself.

Although Ms. Joyce was on the phone at the time the Defendant made this statement, he spoke loudly enough that Ms. Joyce, Ms. McClenney, and Ms. Allen heard his comment. After Principal DeWitt was informed of the Defendant's threat, she returned to the office and heard the Defendant say to W.T., "That's okay, I've got a, you know, I've got to go to the doctor on the 19th and, you know, when I find out I have cancer, I'm going to come back and take care of this." Principal DeWitt testified that she understood this statement to refer back to the Defendant's original threat about bringing an AK-47 to school and killing everyone and himself. Additionally, the evidence supports an inference that the Defendant knew his threat to be false or baseless. During his interview with Detective Crews, the Defendant said that when he was confronted by Principal DeWitt about his statement, he apologized to her and Ms. Joyce.

As to the third element of the false report statute, however, the State did not establish that the Defendant acted knowing that his false report would place a person in fear of "imminent" serious bodily injury. First, based upon the language the Defendant used, it is clear that the Defendant's threat was not imminent. His statements

---

[7] We note that the false reports statute does not contain an explicit requirement that a person's fear of imminent serious bodily injury be reasonable. See Tenn. Code Ann. § 39-16-502(a)(3)(B). There is, however, an implicit requirement that a person's fear be reasonable because the statute requires that a defendant know the false report would place a person in fear of imminent serious bodily injury and a defendant cannot be required to recognize or be aware of a fear that is unreasonable. See Tenn. Code Ann. § 39-11-106(a)(20) (person acts knowingly when the person is aware their conduct is "reasonably certain" to cause a result).

communicated an intent to commit a violent act in the future, after his visit to his doctor the following week, and the act was conditioned upon the occurrence of a future event, *i.e.*, the Defendant receiving a cancer diagnosis. The statements did not communicate an intent to commit violent acts that day. Principal DeWitt testified that she was not in fear of imminent injury based upon the Defendant's comments. While she was concerned about the possibility of the Defendant's returning to the school at some future date, she did not believe that she was facing a threat of harm that would happen at once. Although Ms. Joyce testified that she was in fear, it is not clear from her testimony that she believed any attack by the Defendant was imminent. When Ms. Joyce was asked whether the Defendant was "going to go outside and come right back in, in the next 15, 20 minutes," she replied, "Well, still he made the threat. Whether he came right back in or he came the next day." Second, the reactions of school personnel indicate that the Defendant had no reason to believe his statements would cause them to fear imminent bodily injury. When the Defendant left the office to look at the gingerbread sculpture, Ms. Joyce, Ms. McClenney, and Ms. Allen did not call 9-1-1 or lock the door to keep the Defendant from coming back inside the office. Finally, even though Ms. McClenney and Ms. Allen testified that they were in fear based upon the Defendant's comments, there is no proof that the Defendant was aware of their presence behind the partition when he made the statements. From their vantage point at Ms. McClenney's desk, Ms. McClenney and Ms. Allen could not see the Defendant; they could only hear his voice. The false reports statute, however, requires that the Defendant *knowingly* place a person in fear of imminent serious bodily injury. See Tenn. Code Ann. § 39-16-502(a)(3)(B). Based on the facts of this case, we do not believe any rational trier of fact could conclude that the Defendant made his statements knowing that they would cause school personnel to fear imminent serious bodily injury.

For all of these reasons, the evidence does not establish that the Defendant committed or attempted to commit the offense of initiating or circulating a false report under Tennessee Code Annotated section 39-16-502(a)(3)(B). Because the State failed to prove that the Defendant committed this underlying offense, the Defendant's conviction for attempted terrorism cannot stand. See Tenn. Code Ann. § 39-13-803(1). By our ruling, we do not mean to condone the Defendant's behavior or comments. The Defendant's conduct was foolish, ill-advised, and irresponsible, and the statements attributable to him should never be spoken in a school. Nonetheless, because the evidence is insufficient to support a conviction for attempted terrorism under the facts of this case, we reverse and vacate the Defendant's conviction as to count two. We remand the case for sentencing on the Defendant's judgment of conviction for disorderly conduct in count one.

## B.  Jury Instructions

The Defendant also contends that the trial court provided an incomplete jury charge because the instructions did not contain a definition of what would constitute an "imminent threat of death or serious bodily injury."  The Defendant asserts that the jury instructions should have stated that "a mere expectation of possible future harm" was insufficient to place a person in fear of imminent serious bodily injury and that the State was required to prove the school employees were in a "reasonable probability of danger." The State asserts that the Defendant waived this issue by failing to request a supplemental jury instruction.

An erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection.  See State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Lynn, 924 S.W.2d 892, 898-99 (Tenn.1996)).  When a trial court omits part of the statutory definition for an offense, "[t]he instruction [is] not erroneous, it [is] just incomplete.  Mere meagerness of the charge is not reversible error, in the absence of a special request for an additional charge."  State v. Haynes, 720 S.W.2d 76, 85 (Tenn. Crim. App. 1986).  Alleged omissions in the charge must be called to the trial judge's attention at trial or be regarded as waived.  Id. (citing Rule v. Empire Gas Corp., 563 S.W.2d 551, 554 (Tenn. 1978)).

In this case, the Defendant's contention that the trial court failed to define what constitutes an "imminent threat of death or serious bodily injury" is a claim that the instructions were incomplete, not erroneous.  See also State v. Brian Caswell McGrowder, No. M2013-01184-CCA-R3-CD, 2014 WL 4723100, at *11-12 (Tenn. Crim. App. Sept. 23, 2014), perm. app. denied, (Tenn. Feb. 12, 2015) (holding that a trial court's failure to define the term "position of trust" for the offense of statutory rape by an authority figure merely rendered the instruction incomplete rather than inaccurate).  Thus, we determine that the Defendant has waived this claim and cannot obtain relief absent plain error.  See id.

Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."  See also Tenn. R. Evid. 103(d).  An appellate court may only consider an issue as plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the

accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson factors for determining plain error). Additionally, before we will recognize plain error, the error "must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)) (internal quotation marks omitted).

In this case, the trial court instructed the jury on the offense of initiating or circulating a false report as an element of terrorism as charged in count two of the indictment, as follows:

For you to find the defendant guilty of this offense the state must have proven beyond a reasonable doubt the existence of the following essential elements:

(1) that the defendant intentionally initiated or circulated a report of a past, present, or impending emergency;
And
(2) that the defendant acted knowing the report to be false or baseless;
And
(3) that the defendant acted knowing that the false report would place a person in fear of imminent serious bodily injury.

The trial court defined "serious bodily injury" as

bodily injury that involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty or a broken bone of a child who is eight (8) years or less.

The court defined bodily injury to include "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." The court then defined the mens rea elements of intentionally and knowingly.

Although the record clearly establishes what occurred in the trial court, the Defendant has not shown that a clear and unequivocal rule of law was breached. Under

Tennessee law, a trial court has a duty to provide "a complete charge of the law applicable to the facts of the case." State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)); see also Tenn. R. Crim. P. 30(d)(2). A charge "should not contain inaccurate or inapplicable statements of legal principles that might tend to confuse the jury." State v. Hatcher, 310 S.W.3d 788, 812 (Tenn. 2010) (citations and internal quotation marks omitted). Tennessee law, however, does not mandate that any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. See State v. West, 844 S.W.2d 144, 151 (Tenn. 1992). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); Graham v. State, 547 S.W.2d 531 (Tenn. 1977)).

In determining whether jury instructions are erroneous, this court must review the charge in its entirety and invalidate the charge only if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998). The United States Supreme Court has observed that in evaluating claims of error in jury instructions, courts must remember that

> jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with common sense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

Boyde v. California, 494 U.S. 370, 380-81 (1990). Because questions regarding the propriety of jury instructions are a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001).

Here, the instruction provided by the trial court fully and fairly set forth the law as it applied to the Defendant's charge. The court's instruction concerning the offense of initiating or circulating a false report followed the language of the statute. See Tenn. Code Ann. § 39-16-502(a)(3)(B). It also mirrored the pattern jury instructions. 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 26.02. Because the trial court's instruction was sufficient, the Defendant has not shown a breach of a clear and unequivocal rule of law and is not entitled to plain error review.

### III.  Conclusion

For the foregoing reasons, the Defendant's conviction for attempted terrorism is reversed and vacated.  The case is remanded to the trial court for sentencing on the Defendant's conviction for disorderly conduct in count one.

_____
ROBERT L. HOLLOWAY, JR., JUDGE